UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------
CHANG QUE OH and JOO YOUNG OH,

                     Plaintiffs,

        v.

JOSE R. TRUJILLO-MONTOYA
and HYS LIVERY SERVICE, INC.,

                  Defendants.
------------------------------------------------------------

**MEMORANDUM AND ORDER**
No. 21-CV-1042 (RPK) (PK)

RACHEL P. KOVNER, United States District Judge:

Plaintiff Chang Que Oh was momentarily stopped in traffic when he was rear-ended by a Lincoln limousine operated by Jose R. Trujillo-Montoya. Although Mr. Oh felt no pain at the scene of the accident and was able to drive away in his own vehicle, he claims he sustained "serious" injuries as defined by the New York Insurance Law to his two shoulders, lumbar spine, and cervical spine as a result of the accident. Mr. Oh and his wife, Joo Young Oh, filed this lawsuit against Mr. Trujillo and the registered owner of the Lincoln, HYS Livery Service, Inc., bringing negligence, negligent-entrustment, and loss-of-consortium claims.[1] Defendants have moved for summary judgment. For the reasons explained below, defendants' motion for summary judgment is granted.

## BACKGROUND

The facts in this section are taken from the parties' exhibits and their statements of fact filed in accordance with Local Rule 56.1, unless otherwise noted.

---

[1] Mrs. Oh was not involved in the accident and is only a party to this action to assert her derivative loss-of-consortium claim. For clarity, I refer to only Mr. Oh as the "plaintiff."

## I.   The Accident

Mr. Oh worked as a visual manager for New Deal LLC, d/b/a Against All Odds.  Pl.'s Ex. 2, Oh Dep. Tr. 18:21–19:25 (Dkt. #38-7).  His role required him to split his time between the corporate headquarters in Fort Lee, New Jersey, and the company's retail location at Roosevelt Mall.  *Id*. 19:8–14; 23:7–17.

On the afternoon of Thursday, August 15, 2019, Mr. Oh was driving from the corporate headquarters to Roosevelt Mall.  *Id*. 25:2–12.  As he exited the highway onto an exit ramp, he was momentarily stopped in traffic.  A few seconds later, his car was rear-ended by a Lincoln limousine operated by Mr. Trujillo.  Pl.'s 56.1 Counter ¶¶ 2, 5 (Dkt. #38-2).

Mr. Oh stated that his body was "forced forward abruptly."  *Id*. ¶ 2; Oh Dep. Tr. 34:19–25.  He stated that the force of the impact "was heavy enough that [he] was made to scream out of [his] mouth."  Oh Dep. Tr. 38:9–14; *see* Pl.'s 56.1 Counter ¶ 3.  Mr. Oh's car was "pushed forward a little" by the collision but the car's air bags did not deploy.  Oh Dep. Tr. 39:11–19; 40:2–3.  Mr. Oh had on his seat belt and does not recall any part of his body striking the interior of his car as a result of the collision.  *Id*. 28:10–12; 41:13–17.  Mr. Oh did not feel any pain immediately after the accident but stated that "the dizziness was pretty severe."  *Id*. 42:25–43:4.  He sat in his car for a while, still dizzy, before getting out to check for damage to his car.  *Id*. 42:2–7.

Mr. Oh stated that his car's "back door was damaged and the bumper sank down and the exhaust pi[p]e was damaged."  Oh Dep. Tr. 44:4–10; *see* Pl.'s 56.1 Counter ¶ 4.  The defendants' Lincoln was also damaged.  Pl.'s 56.1 Counter ¶ 5; Oh Dep. Tr. 44:14–21.

Both the police and an ambulance arrived at the scene of the accident.  Oh Dep. Tr. 48:13–49:22.  Mr. Oh does not recall whether he was treated by medical personnel on-site but stated that he did not go to the hospital.  *Id*. 49:23–50:6.  He was able to drive away from the scene in his own vehicle.  *Id*. 50:7–13.

Mr. Oh drove to his original destination—the Roosevelt Mall retail store location—for work.  *Id*. 50:14–17.  However, after 10 to 15 minutes at the store, he continued to feel dizzy and decided to go home.  *Id*. 50:18–22; 52:16–22.

The morning after the accident, a Friday, Mr. Oh woke up and felt "pain in the shoulder, neck and lower back."  *Id*. 54:4–7.  Mr. Oh sought medical treatment the same day.  *Id*. 54:7–9; Pl.'s 56.1 Counter ¶ 6.  Mr. Oh does not recall whether he went to work that day, but states that he went to work the following Monday.  Oh Dep. Tr. 57:25–58:6.

## II.   Plaintiff's Alleged Injuries and Medical Examinations

Mr. Oh claims he sustained injuries to his left and right shoulders, cervical spine, and lumbar spine in the accident.  Defs.' 56.1 Stmt. ¶¶ 3–6; Pl.'s Resp. to Defs.' 56.1 Stmt. ¶¶ 3–6.

The day after the accident, Mr. Oh was examined at Elite Physical Medicine, LLC, and was found to have "severe tenderness and severe muscle spasm on his neck, mid back, low back, right shoulder, right and left hips."  Pl.'s Counter ¶ 6; Pl.'s Ex. 3, Elite Med. Rec. 3 (Dkt. #38-8).[2] Mr. Oh recalls that he also complained about pain in both shoulders, Oh Dep. Tr. 56:20–57:3, though the Elite medical records only indicate discomfort to his right shoulder that day, *see* Elite Med. Rec. 3.  Mr. Oh received acupuncture and chiropractic treatment from Elite Physical for his two shoulders, lumbar spine, and cervical spine until March 10, 2020.  Pl.'s 56.1 Counter ¶ 6; Elite Med. Rec. 33.

---

[2] Defendants argue that plaintiff cannot rely on a number of his medical records because they are either uncertified, not notarized, or not affirmed to be true.  *See* Defs.' Reply 8–10 (Dkt. #39).  However, "even a reference to the unsworn or unaffirmed reports in a defendant's moving papers, including via the defendant's expert reviewing and relying upon them, is sufficient to permit the plaintiff to rely upon and submit these reports in opposition to the motion." *Flores v. Bergtraum* ("*Flores I*"), No. 20-CV-1240 (KMK), 2022 WL 125372, at *12 (S.D.N.Y. Jan. 13, 2022), *aff'd*, *Flores v. Bergtraum* ("*Flores II*"), No. 22-260, 2023 WL 3047968 (2d Cir. Apr. 24, 2023) (quotation marks, brackets, and citation omitted).  Defendants' expert Dr. Kipnis references each of Mr. Oh's medical records in his expert report to support his conclusions.  *See* Defs.' Ex. F, Kipnis Rep. 4–8 (Dkt. #37-8).  Plaintiff may therefore rely on these records.  *See Flores I*, 2022 WL 125372, at *12.

After his initial visit to Elite Physical, Mr. Oh visited numerous other medical facilities. On September 26, 2019, Mr. Oh received an MRI of his lumbar spine and cervical spine from Redi Diagnostics Corp.  Pl.'s 56.1 Counter ¶ 7; Pl.'s Ex. 4, Redi Diagnostics Med. Rec. (Dkt. #38-9). The MRI showed Mr. Oh's cervical spine had a "C3-4 disc bulge with compression of anterior thecal sac and partial effacement of anterior subarachnoid space, and a C5-6 disc bulge with anterior thecal sac and partial effacement of anterior subarachnoid space."  *Ibid*.  The MRI also showed that Mr. Oh's lumbar spine had a "left paracentral L4-5 disc herniation with compression of anterior thecal sac and impingement of descending intraspinal nerve roots."  *Ibid*.

On October 28, 2019, Mr. Oh visited Kayal Orthopedic Center, PC.  Pl.'s 56.1 Counter ¶ 8; *see* Pl.'s Ex. 5, Kayal Med. Rec. (Dkt. #38-10).   Dr. Robert Kayal found Mr. Oh exhibited "significant lower back strain," and recommended Mr. Oh ice, rest, take anti-inflammatory drugs, and avoid strenuous activity.  Pl.'s 56.1 Counter ¶ 8; *see* Kayal Med. Rec. 5.

Mr. Oh then visited the New Horizon Surgery Center.  Pl.'s 56.1 Counter ¶ 9; Pl.'s Ex. 6, New Horizon Med. Rec. 1 (Dkt. #38-11).  After an initial evaluation conducted on November 7, 2019, he received certain manipulation procedures, requiring anesthesia, to his cervical spine, lumbar spine, pelvis, left and right hips, and thoracic spine on November 27, 2019.  Pl.'s 56.1 Counter ¶ 9; New Horizon Med. Rec. 3.

Around the same time, Mr. Oh had an MRI taken of his right shoulder at Cliffside Park Imaging and Diagnostic Center, showing that he had a "focal partial thickness tear of the humeral aspect of the supraspinatus tendon."  Pl.'s 56.1 Counter ¶ 13; Pl.'s Ex. 10, Cliffside Park Med. Rec. 2 (Dkt. #38-15).

On December 5, 2019, Mr. Oh visited Interventional Spine and Surgery Group ("ISSG"). Pl.'s 56.1 Counter ¶ 10.  Dr. Steven Waldman examined Mr. Oh and found that he had decreased

4

ranges of motion ("ROM") in his cervical spine and lumbar spine.  *Ibid.*; Pl.'s Ex. 7, ISSG Med. Rec. 4 (Dkt. #38-12).  During a follow-up visit, Dr. Waldman recommended that Mr. Oh obtain an epidural steroid infusion to his lumbar spine, which he received on January 24, 2020.  Pl.'s 56.1 Counter ¶ 10; ISSG Med. Rec. 13.

Mr. Oh also visited Dr. Joseph Ballpianta in February 2020 for an evaluation of his low back and right shoulder.  Pl.'s Ex. 15, Ballpianta Med. Rec. 4 (Dkt. #38-20).  Dr. Ballpianta provided a care plan for Mr. Oh, stating that Mr. Oh "may continue activities as tolerated," and that "he would like to continue conservative treatment."  *Id.* at 6.  Dr. Ballpianta also noted that Mr. Oh "feels that his right shoulder and low back have improve[d] significantly."  *Id.* at 4.

From July 2020 to June 2021, Mr. Oh was treated by Dr. Ruby Kim for pain in his both shoulders, lumbar spine, and cervical spine.  Pl.'s 56.1 Counter ¶ 11; *see* Pl.'s Ex. 8, Kim Med. Rec. (Dkt. #38-13).  Mr. Oh received various treatments and steroid injections for his lumbar spine, cervical spine, and right shoulder.  *Id.* at ¶¶ 11, 14; *see* Kim Med. Rec.

Mr. Oh reported left shoulder pain to Dr. Kim for the first time in October 2020.  Pl.'s 56.1 Counter ¶ 16; Kim Med. Rec. 32–34.  In response, Dr. Kim administered a steroid injection on November 5, 2020, and then performed a "percutaneous tenotomy" on a tendon in his left shoulder on December 2, 2020.  Pl.'s 56.1 Counter ¶¶ 16–17.; Kim Med. Rec. 89–90.

Mr. Oh engaged in physical therapy for his two shoulders, lumbar spine, and cervical spine at Fort Lee Physical Therapy for a few weeks—from November 9 to November 23, 2020.  Pl.'s 56.1 Counter ¶ 12; *see* Pl.'s Ex. 9, Fort Lee Med. Rec. (Dkt. #38-14).  Active tests showed limited ROM in Mr. Oh's cervical spine and lumbar spine.  Pl.'s 56.1 Counter ¶ 12; Fort Lee Med. Rec. 13.  The records also include active ROM evaluations of plaintiff's two shoulders and a passive

ROM evaluation of plaintiff's left shoulder, but the results are not compared against normal ranges. Pl.'s 56.1 Counter ¶¶ 15, 16; Fort Lee Med. Rec. 13.

Dr. Kim also referred Mr. Oh to Dr. David Deramo at Englewood Knee and Sports Medicine for his left shoulder pain.  Pl.'s 56.1 Counter ¶ 17.  In April 2021, Mr. Oh received an MRI of his left shoulder, which showed "extensive partial thickness interstitial tear within the subscapularis tendon, superior labral tear extending anterior to posterior consistent with a Type II SLAP lesion."  *Id.* ¶ 19; Pl.'s Ex. 11, Englewood Med. Rec. 26 (Dkt. #38-16).

Dr. Deramo then referred Mr. Oh to Dr. Sivaram Rajan at Rajan Orthopaedics and Sports Medicine.  Pl.'s 56.1 Counter ¶ 20.  On May 20, 2021, Dr. Rajan performed left shoulder arthroscopy, subacromial decompression, arthroscopic labral repair, and left arthroscopic distal clavicle excision on Mr. Oh.  *Ibid.*; Pl.'s Ex. 13, Rajan Med. Rec. 7–9 (Dkt. #38-18).

After his surgery, Mr. Oh attended physical therapy for his left shoulder at Advance Care PT from June 2021 to November 2021.  Pl.'s 56.1 Counter ¶ 21; *see* Pl.'s Ex. 17, Advance Care Med. Rec. (Dkt. #38-22).

Despite receiving treatment at ten different medical and physical therapy facilities between August 2019 and October 2021, Mr. Oh sought out another doctor, Dr. Mark McMahon, to assess his injuries more than two years after the accident.  *See* McMahon Aff. (Dkt. #38-4).  Dr. McMahon examined Mr. Oh twice—in October 2021 and November 2022.  Pl.'s 56.1 Counter ¶ 22.  Dr. McMahon diagnosed plaintiff with a "focal partial thickness" in his right shoulder; an "extensive partial thickness interstitial tear," "type II SLAP lesion," "[r]otator cuff syndrome," and "[a]ctivation of acromioclavicular joint arthritis" in his left shoulder; "disc bulges" in parts of his cervical spine; and "disc herniation" in a portion of his lumbar spine.  McMahon Aff. ¶ 6.

Dr. McMahon performed both active and passive ROM assessments, McMahon Suppl. Aff. ¶ 3 (Dkt. # 43), aided by a goniometer, McMahon Aff., Ex. B at 5–7.  The results were as follows:

| | Date | Elevation | | Internal Rotation | | External Rotation | |
|---|---|---|---|---|---|---|---|
| | | Pl. | Norm. | Pl. | Norm. | Pl. | Norm. |
| **Left Shoulder** | 10/20/2021 | 165 | 180 | PSIS* | T10 | 50 | 70 |
| | 11/21/2022 | 175 | 180 | L5 | T10 | 70 | 70 |
| **Right Shoulder** | 10/20/2021 | 175 | 180 | L4 | T10 | 70 | 70 |
| | 11/21/2022 | 175 | 180 | L5 | T10 | 70 | 70 |

*Posterior superior iliac spine

| | Date | Flexion | | Extension | | Left Bend | | Right Bend | |
|---|---|---|---|---|---|---|---|---|---|
| | | Pl. | Norm. | Pl. | Norm. | Pl. | Norm. | Pl. | Norm. |
| **Cervical Spine** | 10/20/2021 | 50 | 50 | 60 | 60 | 30 | 40 | 30 | 40 |
| | 11/21/2022 | 50 | 50 | 60 | 60 | 20 | 40 | 25 | 40 |

| | Date | Flexion | | Extension | | Left Lateral Bending | | Right Lateral Bending | |
|---|---|---|---|---|---|---|---|---|---|
| | Date | Pl. | Norm. | Pl. | Norm. | Pl. | Norm. | Pl. | Norm. |
| **Lumbar Spine** | 10/20/2021 | 75 | 90 | 20 | 20 | 25 | 25 | 25 | 25 |
| | 11/21/2022 | 80 | 90 | 15 | 20 | 25 | 25 | 25 | 25 |

McMahon Aff., Ex. A at 5–6, Ex. B at 6–7.  Dr. McMahon wrote that Mr. Oh could only reach some of these ranges of motion with pain.  *See ibid.*

After reviewing Mr. Oh's medical records, his affidavit, and deposition testimony, Dr. McMahon stated it was his opinion, based upon a reasonable degree of medical certainty, that the accident caused Mr. Oh's injuries.  McMahon Aff. ¶ 5.  Dr. McMahon also opined that Mr. Oh's "prognosis is poor," explaining that his condition is permanent because, more than two years after the accident, Mr. Oh "remains symptomatic to the extent that he continues taking anti-inflammatory medication as well as going to physical therapy."  *Id*. ¶ 8.  Dr. McMahon recommended procedures that Mr. Oh could benefit from and provided their costs, which ranged

from $100 to $50,000. *Ibid*. Dr. McMahon concluded that his "diagnosis was consistent with a serious long lasting injury and are consistent with the mechanism of his injuries relating to his [accident]." *Id*. ¶ 9.

## III.   Effects on Plaintiff's Daily Activities

As a result of continued pain in his shoulders, lumbar spine, and cervical spine, Mr. Oh avers that he has missed work, though he does not specify the number of days. Oh Aff. ¶ 18 (Dkt. #38-1). He further states that in the three to six months after the accident, he was "severely limited in ability to work" because he "could not lift the fixtures to organize the merchandise in the store to do [his] job." *Ibid*. While Mr. Oh testified during his deposition on August 24, 2021, that he was still employed as a visual manager by New Deal LLC, Oh Dep. Tr. 18:21–19:25, his affidavit sworn on November 21, 2022, states that "[b]ecause [he] was unable to do [his] work due to injuries, [he] was terminated from [his] job," Oh Aff. ¶ 19. Mr. Oh also states that the injuries prevent him from playing with his children and helping with household chores. *Id*. ¶ 20.

## IV.   The Defendants' Expert Disclosures

In support of their motion for summary judgment, defendants rely on two experts: Dr. James Kipnis, M.D., and Dr. Jacqueline Lewis Devine, Ph.D.

### A.  Dr. James Kipnis

Defendants retained Dr. James Kipnis, a Fellow of the American College of Surgeons, to conduct an independent medical examination on Mr. Oh. Defs.' 56.1 Stmt. ¶ 8; Defs.' Ex. F, Kipnis Rep. 1. On November 2, 2021, Dr. Kipnis conducted a ROM assessment that produced the following results:

|  | Forward Flexion | | Abduction | | Internal Rotation | | External Rotation | | External Rotation in Abduction | |
|---|---|---|---|---|---|---|---|---|---|---|
|  | Pl. | Norm. | Pl. | Norm. | Pl. | Norm. | Pl. | Norm. | Pl. | Norm. |
| **Left Shoulder** | 160 | 180 | 160 | 180 | L5 | T10 | 70 | 70 | 90 | 90 |
| **Right Shoulder** | 180 | 180 | 180 | 180 | T10 | T10 | 70 | 70 | 90 | 90 |

|  | Extension | | Flexion | | Left Rotation | | Right Rotation | |
|---|---|---|---|---|---|---|---|---|
|  | Pl. | Norm. | Pl. | Norm. | Pl. | Norm. | Pl. | Norm. |
| **Cervical Spine** | 50 | 50 | 40 | 40 | 80 | 80 | 80 | 80 |

|  | Forward Flexion | | Extension | | Left Lateral Bending | | Right Lateral Bending | | Left Rotation | | Right Rotation | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
|  | Pl. | Norm. | Pl. | Norm. | Pl. | Norm. | Pl. | Norm. | Pl. | Norm. | Pl. | Norm. |
| **Lumbar Spine** | 70 | 70 | 20 | 20 | 30 | 30 | 30 | 30 | 30 | 30 | 30 | 30 |

Kipnis Rep. 3–4.

Dr. Kipnis also reviewed Mr. Oh's medical records. *See* Kipnis Rep. 4–8. With respect to Mr. Oh's cervical spine, Dr. Kipnis stated that his examination at Kayal Orthopedics was normal, that the MRI "did not report findings of straightening which would support an acute cervical strain," and that "[t]he report of bulges are common in a 43 year old and are not causally related." *Id*. at 9. With respect to the lumbar spine, Dr. Kipnis opined that Mr. Oh's examination at Kayal Orthopedics "showed 5/5 strength with normal sensation," that the MRI report of "a left sided paracentral disc herniation at L4/5 and the EMG reported finding of a left sided subacute radiculopathy are inconsistent with his testimony transcript of right leg symptoms," and that "there is no causal relationship between the motor vehicle accident and an acute causally related left sided disc herniation." *Id*. at 9–10. With respect to the right shoulder, Dr. Kipnis found that plaintiff's examinations at Kayal Orthopedics and with Dr. Bellapianta were normal, and that the MRI "finding of a focal partial thickness tear is not uncommon in a 43 year old and does not represent an acute traumatic tear." *Id*. at 10. And with respect to the left shoulder, Dr. Kipnis opined that

the MRI showed "no evidence of an acute traumatic Type II SLAP," but that in any event "there is no causal relationship between the motor vehicle accident and the type II SLAP tear that was described." *Ibid*.

Based on his review of the medical records and examination, Dr. Kipnis concluded that Mr. Oh "did not incur a significant injury to his cervical spine, lumbar spine, right or left shoulder. The described mechanism of injury, the lack of complaints at the scene, the lack of need for acute medical attention and the lack of an acutely needed x-ray of any of these areas are inconsistent with a serious injury." *Id*. at 9.

**B.  Dr. Jacqueline Lewis Devine**

Defendants also retained Dr. Jacqueline Lewis Devine, who goes by Dr. Lewis professionally, as a biomechanical expert to "evaluate[] the severity of the subject incident and conduct[] a parametric energy-based crush analysis and a kinematic analysis of the subject incident." Defs.' Mem. in Supp. of Mot. for Summ. J. 2 (Dkt. #37). In making her expert evaluation, Dr. Lewis reviewed plaintiff's medical records and reports, deposition testimony and interrogatory responses, as well as materials documenting the damage to the parties' vehicles. *See* Defs.' Ex. G, Lewis Rep. 2–3 (Dkt. #37-9).

As a threshold matter, I may consider Dr. Lewis's expert report because although it was unsworn, she subsequently affirmed the contents of her report in her sworn deposition testimony. While "unsworn expert reports do not satisfy the admissibility requirements of Fed. R. Civ. P. 56(e)," *Reza v. Khatun*, No. 09-CV-233 (MKB), 2017 WL 3172816, at *2 (E.D.N.Y. July 25, 2017) (citation omitted), "[s]ubsequent verification or reaffirmation of an unsworn expert's report, either by affidavit or deposition, allows the court to consider the unsworn expert's report on a motion for summary judgment," *Richardson v. Corr. Med. Care, Inc*., No. 22-210, 2023 WL 3490904, at *2 (2d Cir. May 17, 2023) (citation omitted). Dr. Lewis reaffirmed her opinion during

her sworn deposition, testifying that her "opinion is that . . . the force of this incident did not cause the . . . specific injuries that [she] addressed in [the expert] report." Lewis Dep. Tr. 76:5–8 (Dkt. #41).

In her expert report, Dr. Lewis opined that the severity of the accident was consistent with a force of less than 10 miles per hour and an acceleration of "less than 3g." Lewis Rep. 15. Such forces, she observed, were within the limits of human-body tolerance and consistent with those experienced during various daily activities. *Ibid*. She therefore concluded "that there is no injury mechanism present in the subject incident to account for" plaintiff's claimed injuries to his cervical spine, lumbar spine, or both shoulders. *Id*. at 16.

## V.   Procedural History

Plaintiff filed this lawsuit in February 2021, alleging that he sustained serious injuries as defined by New York Insurance Law § 5102(d). Compl. ¶¶ 41–42 (Dkt. #1). Plaintiff brings a negligence claim against Mr. Trujillo, *id*. ¶¶ 12–23, and negligence and negligent entrustment claims against Hy's Livery Service, Inc., *id*. ¶¶ 24–57. Plaintiff's wife sues for loss of consortium. *Id*. ¶¶ 58–63. Defendants have moved for summary judgment. *See* Defs.' Mot. for Summ. J. (Dkt. #36).

## STANDARD OF REVIEW

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "An issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Frost v. N.Y.C. Police Dep't*, 980 F.3d 231, 242 (2d Cir. 2020) (quoting *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009)). "A fact is material if it might affect the outcome of the suit under governing law." *Ibid*. The movant bears the burden of

"demonstrat[ing] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

"However, when the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim," in which case "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *CILP Assocs., L.P. v. PriceWaterhouse Coopers LLP*, 735 F.3d 114, 123 (2d Cir. 2013) (quotation marks and brackets omitted).  The nonmoving party can survive summary judgment only if there is sufficient evidence to permit a rational trier of fact to find in that party's favor.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

In determining whether there is a genuine issue of material fact, the Court evaluates the whole record, resolving all ambiguities and drawing all permissible factual inferences in favor of the non-movant.  *Tracy v. Freshwater*, 623 F.3d 90, 95 (2d Cir. 2010).  "It is a settled rule that credibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the court on a motion for summary judgment." *McClellan v. Smith*, 439 F.3d 137, 144 (2d Cir. 2006) (quotation marks, alterations, and citation omitted).

## DISCUSSION

Defendants are entitled to summary judgment on plaintiff's claim that he suffered serious injuries to his left and right shoulders, cervical spine, and lumbar spine that were proximately caused by the traffic accident.  Because Mrs. Oh's loss-of-consortium claim cannot proceed without a viable primary cause of action, defendants are also granted summary judgment on that claim.

I.    **Summary Judgment Is Granted on Plaintiff's Claim that He Suffered a "Serious Injury" Proximately Caused by the Traffic Incident**

Defendants are entitled to summary judgment because plaintiff did not suffer a serious injury proximately caused by the accident.

Under the New York Insurance Law (also referred to as the "no-fault" law), in a case involving personal injuries resulting from a car accident, "there is no right of recovery in tort unless a covered person sustained a 'serious injury.'" *Yong Qin Luo v. Mikel*, 625 F.3d 772, 776 (2d Cir. 2010); *see Smith v. Gray*, No. 19-CV-2169 (NGG) (CLP), 2021 WL 3603588, at *4 (E.D.N.Y. Aug. 13, 2021). The purpose of the no-fault law is "to weed out frivolous claims and limit recovery to significant injuries." *Dufel v. Green*, 647 N.E.2d 105, 107 (N.Y. 1995). Thus, "[i]n order to recover damages for non-economic loss related to a personal injury allegedly sustained in a motor vehicle accident, a plaintiff is required to present competent, non-conclusory expert evidence sufficient to support a finding, not only that the alleged injury is 'serious' within the meaning of Insurance Law § 5102(d), but also that the injury was proximately caused by the accident at issue." *Perpall v. Pavetek Corp.*, No. 12-CV-0336 (PKC), 2017 WL 1155764, at *12 (E.D.N.Y. Mar. 27, 2017) (quoting *Carter v. Full Serv., Inc.*, 815 N.Y.S.2d 41, 43 (App. Div. 2006)).

The no-fault statute enumerates nine categories of "serious injury." N.Y. Ins. Law § 5102(d). At issue here are three of those categories: (i) a "permanent consequential limitation of use of a body organ or member"; (ii) a "significant limitation of use of a body function or system"; and (iii) "a medically determined injury or impairment of a non-permanent nature which prevents the injured person from performing substantially all of the material acts which constitute such person's usual and customary daily activities for not less than ninety days during the one hundred eighty days immediately following the occurrence of the injury or impairment,"

commonly referred to as the "90/180" category, *see Ruffin v. Rana*, No. 11-CV-5406 (MHD), 2013 WL 4834368, at \*7 (S.D.N.Y. Sept. 4, 2013).[3]

A motion for summary judgment based on the absence of a serious injury is governed by New York law's "burden-shifting scheme." *Yong Qin Luo*, 625 F.3d at 777 (quoting *Barth v. Harris*, No. 00-CV-1658, 2001 WL 736802, at \*2 (S.D.N.Y. June 25, 2001)).   Under that framework, a defendant must first "establish a prima facie case that plaintiff did not sustain a 'serious injury' within the meaning of Insurance Law § 5102(d)." *Ibid*.  To do so, a "defendant may rely on the unsworn reports by plaintiff's physicians, but must provide evidence from its own physicians in the form of sworn affidavits." *Ibid*.

If a defendant meets this burden, "the plaintiff is then required to establish a prima facie case that he sustained a serious injury," by providing "admissible evidence . . . in the form of sworn affidavits by physicians." *Ibid*.  Plaintiff must supply "objective proof of a plaintiff's injury in order to satisfy the statutory serious injury threshold; subjective complaints alone are not sufficient." *Toure v. Avis Rent A Car Systems, Inc.*, 774 N.E.2d 1197, 1199–200 (N.Y. 2002) (citations omitted).  The objective proof may be satisfied by "an expert's designation of a numeric percentage of a plaintiff's loss of range of motion." *Ibid*.  Alternatively, "[a]n expert's qualitative assessment of a plaintiff's condition may also suffice, provided that the evaluation has an objective basis and compares the plaintiff's limitations to the normal function, purpose and use of the affected body organ, member, function or system." *Ibid.* (emphasis omitted); *see Rivera*, 2012

---

[3] While defendants also seek summary judgment on a fourth category of serious injury—a "permanent loss of use of a body organ, member, function or system," Defs.' Mem. in Supp. of Mot. for Summ. J. 4–6—the complaint does not plausibly allege that plaintiff sustained such an injury. *See generally* Compl.  To the extent the complaint does raise such a claim, plaintiff has abandoned it by failing to respond to defendants' arguments for summary judgment on this claim. *See Dynamic Concepts, Inc. v. Tri-State Surgical Supply & Equip. Ltd.*, 716 F. App'x 5, 14 (2d Cir. 2017) ("Where a partial response to a motion [for summary judgment] is made—*i.e.*, referencing some claims or defenses but not others . . . in the case of a counseled party, a court may, when appropriate, infer from a party's partial opposition that relevant claims or defenses that are not defended have been abandoned." (alteration and omission in original) (quoting *Jackson v. Fed. Express*, 766 F.3d 189, 197–98 (2d Cir. 2014)).

14

WL 3132667, at *10 (collecting cases); *Hamad v. Cook*, No. 13-CV-3222 (MHD), 2014 WL 3507340, at *9 (S.D.N.Y. June 30, 2014).

This burden-shifting framework similarly applies to a summary judgment motion predicated on the lack of a causal link between the alleged serious injuries and the accident. The defendants bear the initial burden of demonstrating the lack of direct causation, or that "additional contributory factors interrupt the chain of causation between the accident and claimed injury— such as a gap in treatment, an intervening medical problem or a preexisting condition." *Joseph v. STMR Inc.*, No. 19-CV-125 (ENV) (RER), 2022 WL 5173669, at *8 (E.D.N.Y. Aug. 24, 2022) (quoting *Pommells v. Perez*, 4 N.Y.3d 566, 572 (2005)). If the defendants meet their initial burden, the burden shifts to the plaintiff to "come forward with evidence addressing the defendant's claimed lack of causation." *Evans v. United States*, 978 F. Supp. 2d 148, 164 (E.D.N.Y. 2013) (citation omitted).

### A. Plaintiff Has Not Adduced Sufficient Evidence to Support a Claim of "Permanent Consequential" or "Significant" Limitation Injury Proximately Caused by the Accident

Defendants are entitled to summary judgment on plaintiff's claim that he suffered either a permanent consequential or significant-limitation injury that was proximately caused by the accident. Courts evaluate whether a plaintiff sustained a permanent-consequential-limitation injury or a significant-limitation injury under the same standard. *See Toure*, 774 N.E.2d at 1201; *Gaddy v. Eyler*, 591 N.E.2d 1176, 1177 (N.Y. 1992). Whether "a limitation of use or function is 'significant' or 'consequential' (*i.e.*, important) relates to medical significance and involves a comparative determination of the degree or qualitative nature of an injury based on the normal function, purpose and use of the body part.'" *Toure*, 774 N.E.2d at 1201 (alteration omitted) (quoting *Dufel*, 647 N.E.2d at 107). "While there is no set percentage for determining whether a limitation in range of motion is sufficient to establish 'serious injury,' the cases have generally

found that a limitation of twenty percent or more is significant for summary judgment purposes." *Hodder v. United States*, 328 F. Supp. 2d 335, 356 (E.D.N.Y. 2004) (collecting cases).  In addition, "a limitation of motion that has resolved [is not] sufficient to establish significant limitation." *Cooper v. Dunn*, No. 99-CV-6903 (ILG), 2001 WL 138864, at *6 (E.D.N.Y. Jan. 2, 2001) (citing *Schultz v. Von Voight,* 628 N.Y.S.2d 388, 389 (App. Div. 1995)).  As explained below, while plaintiff has adduced sufficient evidence for a jury to find that he had some injuries that met this standard, plaintiff has not adduced sufficient evidence for a jury to find that those injuries were proximately caused by the car accident.

> 1. *Defendants Established a Prima Facie Case That Plaintiff Did Not Suffer a Permanent Consequential or Significant Limitation Proximately Caused By the Incident*

Defendants have made out a prima facie case that plaintiff did not suffer either a permanent consequential or significant-limitation injury proximately caused by the incident.

**Permanent Consequential or Significant Limitation**.  Defendants established a prima facie case that plaintiff did not suffer permanent consequential or significant-limitation injuries to his right shoulder, cervical spine, or lumbar spine.  Defendants may establish, prima facie, a lack of serious injury through the sworn report of their medical expert, "who conduct[s] an independent medical examination of plaintiff and conclude[s] that . . . there was no objective evidence of any [injury]."  *Watson-Tobah v. Royal Moving & Storage, Inc*., No. 13-CV-7483, 2014 WL 6865713, at *17 (S.D.N.Y. Dec. 5, 2014).  Here, plaintiff's medical expert Dr. Kipnis submitted a sworn expert report, which contained a ROM test assessing plaintiff with full ranges of motion in his right shoulder, cervical spine, and lumbar spine.  Kipnis Rep. 3–4; *see* pp. 8–9, *supra*.  Dr. Kipnis opined that Mr. Oh's "cervical and lumbar spine examinations were within normal limits" and that "[h]e had a normal exam of his right shoulder."  *Id*. at 9.  Dr. Kipnis also noted that Mr. Oh

"currently has no complaints regarding his neck, back or his right shoulder." *Ibid*. Such findings are sufficient to establish defendants' prima facie case.

Defendants, however, have not established a prima facie case that plaintiff did not sustain a permanent consequential or significant-limitation injury to his left shoulder. Dr. Kipnis's report reflected that plaintiff had an approximately 11% decrease in his forward flexion and abduction ranges, and an internal rotation in adduction ROM to L5, with the normal ROM being to T10. *Ibid*. The limited ROMs in Mr. Oh's forward flexion and abduction are too minor to be "significant." *See, e.g.*, *Cooper v. Dunn*, 2001 WL 138864, at *7 (holding 10%–20% limitations in ROMs were not significant). But plaintiff's ability to internally rotate in adduction to L5 when the normal range is to T10 is less susceptible to quantification. Defendants have not come forward with evidence or case law to support that this limitation is not significant. Defendants have therefore failed to establish a prima facie case that plaintiff did not sustain a permanent consequential or significant-limitation injury to his left shoulder.

*Causation*. Defendants established a prima face case that plaintiff's alleged permanent consequential and significant-limitation injuries to his two shoulders, cervical spine, and lumbar spine were not causally related to the accident. "[W]hen additional contributory factors interrupt the chain of causation between the accident and claimed injury—such as a gap in treatment, an intervening medical problem or a preexisting condition—summary dismissal of the complaint may be appropriate." *Pommells*, 830 N.E.2d at 281. Defendants may therefore establish a prima facie lack of causation by submitting persuasive evidence that, among other things, the injury is degenerative, not traumatic, in nature; and the manner of and amount of force from the accident were incapable of causing the injuries. *See, e.g.*, *Altman v. Shaw*, 126 N.Y.S.3d 526, 530 (App. Div. 2020).

Defendants established, prima facie, a lack of causation principally through the expert reports of Dr. Kipnis and Dr. Lewis.  As to plaintiff's cervical spine, Dr. Kipnis opined that the reported bulges in plaintiff's cervical spine "are common in a 43 year old and are not causally related" to the accident.  Kipnis Rep. 9.

With respect to plaintiff's lumbar spine, a review of "the described mechanism of injury, the lack of complaints at the scene, the lack of need for acute medical attention and the lack of an acutely needed x-ray," in addition to plaintiff's medical records—which showed "5/5 strength with normal sensation"—led Dr. Kipnis to conclude that there was "no causal relationship between the motor vehicle accident" and the disc herniation in his lumbar spine.  *Id.* at 10.

With respect to plaintiff's right shoulder, Dr. Kipnis opined that the "MRI finding of a focal partial thickness tear is not uncommon in a 43 year old and does not represent an acute traumatic tear.  This is further supported by the MRI finding of a lack of glenohumeral joint effusion" *Ibid*.

Finally, as to plaintiff's left shoulder, Dr. Kipnis opined that the "mechanism of injury and the lack of acute left shoulder pain at the time of the accident are not consistent with an acute traumatic type II SLAP tear." *Id.* at 10.  He noted that plaintiff first reported pain in his left shoulder more than one year after the accident, and that "[a]cute traumatic tears of the shoulder do not present in this manner." *Ibid*.  He therefore opined that plaintiff had "no causally related disability regarding his left shoulder." *Ibid*.

Indeed, plaintiff's medical records do not indicate that plaintiff complained of any injury to his left shoulder until October 2020, more than one year after the accident.  Although Elite Physical medical records indicate that plaintiff received acupuncture treatment to both his shoulders from October 2019 to March 2020, Elite Med. Rec. 34–59, they do not, as plaintiff

suggests, indicate that he complained of discomfort in his left shoulder at any of his visits, *see, e.g.*, Elite Med. Rec. 3 (circling only the right shoulder for "C/O pain/discomfort" and for "Radiation pain down to"); *see id*. at 4–33 (same).  Plaintiff also asserts that his medical records from his visit with Dr. Waldman at ISSG reflect that he complained of cervical pain that radiated to his left shoulder and left arm.  Pl.'s Resp. to Defs.' 56.1 Stmt. ¶ 9.  However, those medical records indicate that plaintiff suffered only from "[b]ack pain with pain radiating into the left *lower extremity*," and that "[g]etting out of the car causes pain to radiate into the left *lower extremity*." ISSG Rec. 4 (emphasis added).  Even if plaintiff had complained of left shoulder pain at these visits, there are no medical records indicating that plaintiff received any treatment for his left shoulder between the time his acupunctural treatment ceased in March 2020 and when he complained of his left shoulder pain to Dr. Kim in October 2020.  *See Osorio v. Punjab Enter. Inc.*, 187 N.Y.S.3d 35, 36 (App. Div. 2023) (finding that an unexplained gap "between completion of physical therapy and the time she next saw a doctor for her" injury pertinent to establishing defendant's prima facie case).

Defendants further bolster their prima facie case for lack of causation through Dr. Lewis's expert opinion that the force from the car accident was insufficient to serve as an "injury mechanism" for any of plaintiff's alleged injuries.  Lewis Rep. 16.  Dr. Lewis performed "biomechanical injury causation" analyses of the alleged injuries to plaintiff's cervical spine, lumbar spine, and both shoulders."  *Id.* at 11, 13, 15.  For each of plaintiff's alleged injuries, her analyses indicated that "the forces and accelerations that he experienced were within his personal tolerance levels and were comparable to, or less than, those associated with typical activities of daily living."  *Ibid*.  She therefore concluded "that there is no injury mechanism present in the subject incident to account for" plaintiff's claimed injuries to his cervical spine, lumbar spine, or

shoulders.  *Id*. at 15–16.  While plaintiff contests the Court's ability to consider this type of evidence on summary judgment, *see* Pl.'s Mem. in Opp'n 8 (Dkt. #38), courts in New York have routinely relied on biomechanical expert reports in finding defendants to have made out a prima facie case for lack of causation, *see, e.g.*, *Jung v. Kelly*, No. 16-CV-6097 (PK), 2020 WL 7024395, at *11 (E.D.N.Y. Nov. 30, 2020); *Osorio*, 187 N.Y.S.3d at 36; *Holmes v. Brini Transit Inc.*, 1 N.Y.S.3d 27, 28 (App. Div. 2014).

The burden therefore shifts to plaintiff to establish a prima facie case that he sustained serious injuries to his right shoulder, cervical spine, and lumbar spine, and that any of his alleged injuries were sufficiently causally related to the accident.

### 2. *Plaintiff Fails to Establish a Prima Facie Case That He Suffered a Permanent Consequential or Significant Limitation Proximately Caused by the Incident*

While Plaintiff establishes a prima facie case that he suffered permanent consequential or significant-limitation injuries to his right shoulder, cervical spine, and lumbar spine, he fails to establish a prima facie case that any of his injuries were proximately caused by the accident.

***Permanent Consequential or Significant Limitation.***   Plaintiff provides sufficient objective evidence to make out a prima facie case that he has permanent consequential or significant-limitation injuries to his right shoulder, cervical spine, and lumbar spine.  In support of his prima facie case, plaintiff relies on the ROM assessments conducted by Dr. Waldman in December 2019, by Fort Lee Physical Therapy in November 2020, and by Dr. McMahon in October 2021 and November 2022.  Pl.'s Mem. in Opp'n 9–10.

In order to meet a plaintiff's burden at the summary judgment stage, medical findings regarding ROM "must indicate the methodology used to calculate the reduced ROM, as well as whether such methodology consisted of active or passive ROM tests."  *Flores I*, 2022 WL 125372, at *12 (citation omitted).  In an active ROM test, "the patient is asked to move the body part at

issue in various directions and is asked to indicate when further movement becomes restricted or painful." *Hodder v. United States*, 328 F. Supp. 2d 335, 355 (E.D.N.Y. 2004) (citations omitted). In contrast, in a passive ROM test, "the examiner moves the injured body part until the motion is restricted or pain is created." *Ibid.* "The results of the passive test are 'based upon more objective criteria,' because the doctor controls the movements." *Ibid.* Courts have therefore found that active ROM tests are "insufficient to support an objective finding of a serious injury" because they are "dependent on the patient's subjective expressions of pain." *Gillick v. Knightes*, 719 N.Y.S.2d 335, 336 (App. Div. 2001). In addition, ROM assessments that do not indicate "the methodology used to calculate the degrees of restriction and whether the tests conducted were passive or active range-of-motion tests" are "insufficient to overcome defendants' prima facie showing of the absence of a serious injury." *Watson-Tobah*, 2014 WL 6865713, at *18.

Here, the ROM evaluations conducted by Fort Lee Physical Therapy on plaintiff's cervical spine, lumbar spine, and right shoulder were all "AROM," or active ROM tests. *See* Fort Lee Med. Rec. 13. These medical records are therefore not sufficiently objective to support plaintiff's prima facie case. *See Gillick*, 719 N.Y.S.2d at 336. In addition, plaintiff cannot rely on Dr. Waldman's ROM evaluation because he did not indicate whether he performed an active or passive ROM test. ISSG Med. Rec. 4 (no discussion of whether ROM test was active versus passive); *see Flores I*, 2022 WL 125372, at *12; *Ruffin*, 2013 WL 4834368, at *12.

Plaintiff may rely on Dr. McMahon's ROM assessments because Dr. McMahon clarified that the "methodology used to calculate the ROM consisted of both Active (AROM) and Passive range of motion (PROM) tests." McMahon Supp. Aff. ¶ 3 (Dkt. #43). Dr. McMahon's ROM assessments establish a prima facie case that plaintiff sustained permanent consequential or significant-limitation injuries to his right shoulder, cervical spine, and lumbar spine. A ROM

limitation of twenty percent or more is sufficiently significant to establish a permanent consequential or significant-limitation injury for summary judgment purposes.  *Hodder*, 328 F. Supp. 2d at 356; *see, e.g.*, *Livai v. Amoroso*, 658 N.Y.S.2d 973, 973 (App. Div. 1997) (20% restriction of motion in cervical spine); *Amofa v. N.S.C. Leasing Corp.*, 668 N.Y.S.2d 460, 460 (App. Div. 1998) (25% restriction of motion in spine).  Dr. McMahon's November 2022 ROM assessment indicates that, while plaintiff had several ROMs with little to no limitations, he could (i) internally rotate his right shoulder to L5, with the normal range being to T10; (ii) bend his cervical spine 20° to the left and 25° to the right, with normal ranges for both sides being 40° (50% and 37.5% limitations, respectively); and (iii) extend his lumbar spine to 15°, with the normal range being 20° (25% limitation).  McMahon Aff., Ex. B at 6–7.  As discussed above, *see* p. 17, *supra*, although a ROM limitation to L5 is not easily convertible to percentage terms, that limitation appears significant.  Accordingly, plaintiff has put forth sufficient evidence that the injuries to his right shoulder, cervical spine, and lumbar spine were significant.

  ***Causation.***  Plaintiff, however, cannot establish a prima facie causal link between the accident and the ROM limitations in his two shoulders, cervical spine, and lumbar spine.  "Courts applying New York law repeatedly have entered summary judgment in favor of defendants in personal injury actions where there was a lack of nonconclusory medical testimony establishing proximate causation."  *Flores I*, 2022 WL 125372, at *16 (quoting *Watson-Tobah*, 2014 WL 6865713, at *14).  Thus, conclusions of causation "which fail[] to provide any explanation for how" a medical practitioner "reached [that] conclusion based on the materials he reviewed" is "insufficient to create a material dispute as to the cause of [plaintiff's] injury."  *Flores II*, 2023 WL 3047968, at *2.

In support of his prima facie case that the accident proximately caused plaintiff's injuries, plaintiff points to the deposition testimony of Dr. McMahon, an October 28, 2019 report by Dr. Kayal, and a February 19, 2020 report by Dr. Bellapianta.  *See* Pl.'s Mem. in Opp'n 11–12.  None of these pieces of evidence carry plaintiff's causation case over the prima facie line.

Dr. McMahon's expert report concludes, without any explanation, that "this rear end accident was the component producing cause of [plaintiff's] injuries, treatment, surgery, and future surgeries."  McMahon Aff. ¶ 5.  While Dr. McMahon reaffirms his opinion in his deposition, he does not further explain how he came to this conclusion.  *See* McMahon Dep. Tr. 47:14–24. Similarly, Dr. Bellapianta summarily concludes that "it is within a reasonable degree of medical probability that [plaintiff's] right shoulder pain is causally related to the motor vehicle accident." Bellapianta Med. Rec. 6.  Without explaining how they arrived at their respective causal conclusions, Dr. McMahon's and Dr. Bellapianta's opinions do not help plaintiff clear the prima facie hurdle.  *See Flores I*, 2022 WL 125372, at *13 (finding plaintiff's doctor's conclusions that plaintiff's injuries "are traumatic in origin and causally related to the motor vehicle accident . . . fall far short of meeting [p]laintiff's required burden.").

Dr. Kayal provides marginally more explanation by reasoning that plaintiff's symptoms are, within a reasonable degree of medical probability, causally connected with the accident because plaintiff himself "denie[d] any of these symptoms prior to the motor vehicle accident." Kayal Med. Rec. 5.  But a mere recitation of plaintiff's own "purported causation without any scrutiny or questioning" is also not sufficient to constitute nonconclusory medical testimony. *Flores I*, 2022 WL 125372, at *13.  And even were Dr. Kayal's opinion sufficiently nonconclusory, Dr. Kayal only noted that plaintiff exhibited "significant lower back strain," Pl.'s 56.1 Counter ¶ 8, and provided no ROM assessments as to plaintiff's shoulders, cervical spine, or even his

lumbar spine, *see generally* Kayal Med. Rec.  His opinion therefore does not supply any causal link between the accident and limitations in plaintiff's ROMs—the only basis on which plaintiff establishes, prima facie, he suffered a permanent consequential or significant-limitation injury.

In sum, while plaintiff established a prima facie case that he suffered permanent consequential or significant-limitation injuries to his right shoulder, cervical spine, and lumbar spine, he failed to proffer sufficient evidence to make out a prima facie case that these injuries, or injury to his left shoulder, were proximately caused by the accident.  Summary judgment is therefore granted to defendants with respect to plaintiff's claim that he sustained permanent consequential or significant-limitation injuries.

### B.  There Is No Genuine Dispute That Plaintiff Did Not Sustain a 90/180 Day Injury

Defendants are also entitled to summary judgment on plaintiff's claim that he suffered a 90/180 day injury.  An injury falls within the 90/180 day category if it "prevent[ed] the injured person from performing substantially all of the material acts which constitute such person's usual and customary daily activities" for 90 of 180 days following the accident.  N.Y. Ins. Law § 5102(d).  "The term 'substantially all' 'should be construed to mean that the person has been curtailed from performing his usual activities to a great extent rather than some slight curtailment.'"  *Flores I*, 2022 WL 125372, at *9 (quoting *Sanchez v. Travelers Cos.*, 658 F. Supp. 2d 499, 508 (W.D.N.Y. 2009)).

### 1.  *Defendants Established a Prima Facie Case that Plaintiff Did Not Suffer a 90/180 Day Injury*

Defendants have made out a prima facie case that plaintiff did not suffer a 90/180 day injury proximately caused by the incident.

"New York courts have frequently held that there is no 'serious injury' under the 90/180 category as a matter of law, and thus that summary judgment for a defendant is appropriate, if a

plaintiff returns to work within 90 days of a car accident." *Hernandez v. Leichliter*, No. 14-CV-5500 (AJN), 2016 WL 676455, at *2 (S.D.N.Y. Feb. 17, 2016) (collecting cases). In fact, "the 90/180 case law . . . establish[es] that a prompt return to one's previous job constitutes 'a prima facie case that plaintiff's injuries were not serious.'" *Ibid*. (citation omitted). Here, it is uncontested that plaintiff returned to work the Monday following the accident, missing at most one full day of work. Oh Dep. Tr. 57:25–58:6. That alone is sufficient to establish a prima facie case that plaintiff did not sustain a 90/180 day injury.

### 2. Plaintiff Has Not Established a Prima Facie Case that He Suffered a 90/180 Day Injury

In response, plaintiff fails to make out his own prima facie case. Plaintiff avers that he "missed work due to [his] injuries" but does not provide any quantification. Oh Aff. ¶ 18. He also states he was "severely limited in ability to work" because he "could not lift the fixtures to organize the merchandise in the store to do [his] job." *Ibid*. In addition, while plaintiff was still employed by New Deal LLC as of August 24, 2021—more than two years after the accident, Oh Dep. Tr. 18:21–19:25—he averred in November 2022 that he was terminated from his job "[b]ecause [he] was unable to do [his] work due to injuries," Oh Aff. ¶ 19. Plaintiff also states that the injuries prevent him from playing with his children and helping with household chores. *Id*. ¶ 20. These facts are insufficient to make out a prima facie case.

Plaintiff's claim that he could not perform some of his regular job duties does not establish a prima facie case. While "there exist a handful of cases in which plaintiffs were found to have suffered short-term serious injuries notwithstanding quick returns to work, the majority of the cases hold that doing so, even on a limited, light, or restricted basis, weighs heavily against establishing a short-term serious injury." *Flores I*, 2022 WL 125372, at *11 (collecting cases); *see, e.g.*, *Martin v. Portexit Corp.*, 948 N.Y.S.2d 21, 24 (App. Div. 2012) (holding that the plaintiff

could not sustain a 90/180 day injury claim because he "returned to work on a part time/light duty schedule approximately three weeks after the accident"); *Murphy v. Arrington*, 744 N.Y.S.2d 255, 256–57 (App. Div. 2002) (no 90/180 day injury where plaintiff missed only six weeks of work after the accident and was put on light duty assignment for another six weeks). Plaintiff offers no persuasive reason why the Court should depart from this majority view.

Plaintiff's contention that he lost his job more than two years after the accident because he could not adequately perform his work duties also does not establish a prima facie case. A plaintiff's "testimony that he was terminated during the relevant period due to his inability to perform his work without the assistance of a helper, unsupported by any documentation from his employer, is insufficient to support his claim" of a 90/180 day injury. *Martin*, 948 N.Y.S.2d at 24. Here, plaintiff's bare assertion that he was terminated well after 180 days following the accident because of his inability to perform his job functions is not supported by any other evidence and therefore cannot help him make out his prima facie case.

The case law also forecloses plaintiff's attempt to rely on his limited ability to perform household activities as prima facie evidence of a 90/180 day injury. Courts routinely find that allegations of difficulty completing household chores are insufficient to make out a prima facie case of 90/180 day injury. *See, e.g.*, *Flores I*, 2022 WL 125372, at *11 (finding plaintiff's alleged difficulty performing household chores, such as laundry, cooking, and cleaning insufficient because these activities "do not rise to the level of 'substantially all . . . normal activities.'" (citation omitted)); *Gil v. W. Express, Inc.*, No. 15-CV-9611, 2017 WL 4129634, at *12 (S.D.N.Y. Sept. 14, 2017) (similar); *Tenzen v. Hirschfeld*, No. 10-CV-50, 2011 WL 6034462, at *8 (E.D.N.Y. Dec. 5, 2011) (similar).

Because plaintiff failed to establish a prima facie case that he sustained a 90/180 day injury, summary judgment is granted to defendants on plaintiff's claim with respect to this category of serious injury.

## II.    Summary Judgment Is Granted on Mrs. Oh's Loss-of-Consortium Claim

Mrs. Oh's loss-of-consortium claim falls with the grant of judgment against her husband's substantive claims.  Under New York law, "a claim for loss of consortium is a derivative action and, as such, its viability is dependent on the viability of a primary cause of action."  *Jones v. United States*, 408 F. Supp. 2d 107, 126 (E.D.N.Y. 2006) (internal quotation marks and citation omitted); *see Waldman v. Atl.-Heydt Corp.*, No. 04-CV-2154 (SJ), 2006 WL 2010783, at *1 (E.D.N.Y. July 14, 2006) ("[C]onsortium claims . . . are derivative; plaintiff's right of recovery for loss of consortium must be tested against the injured spouse's right to recover personally for his own injuries." (quoting *Maidman v. Stagg,* 441 N.Y.S.2d 711, 713 (App. Div. 1981))).  Summary judgment is therefore granted to defendants on Mrs. Oh's loss-of-consortium claim.

## CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment is granted in its entirety.  The Clerk of Court is directed to enter judgment and close this case.

SO ORDERED.

*/s/ Rachel Kovner*
RACHEL P. KOVNER
United States District Judge

Dated: March 25, 2024
Brooklyn, New York